Filed 3/6/19; Certified for Publication 4/3/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| POINT SAN PEDRO ROAD COALITION,<br>     Plaintiff and Respondent,<br>v.<br>COUNTY OF MARIN et al.,<br>     Defendants and Appellants;<br>SAN RAFAEL ROCK QUARRY, INC.,<br>     Real Party in Interest and Appellant. | A150002<br><br>(Marin County<br>Super. Ct. No. CIV1504430) |

Real Party in Interest, San Rafael Rock Quarry Inc. (SRRQ), owns property in the County of Marin (County) on which is situated both a mining operation (Quarry) and a plant that produces asphaltic concrete. In 1982, at the time the Quarry and plant operations became a nonconforming use under the County zoning ordinance, asphaltic concrete was produced on-site by processing mined material from the quarry and imported sand, but no other imported materials were used such as asphalt grindings. In 2013, the County issued a resolution, with an expiration date of October 1, 2015, that granted SRRQ's request to import asphalt grindings to be processed on-site and used in the production of asphaltic concrete (Amendment No. 2). In 2015, the County extended the expiration date of Amendment No. 2 for another two to four years in Resolution No. 2015-108.

Petitioner, Point San Pedro Road Coalition (Coalition)[1], filed a petition for a writ of mandate seeking to compel the County to set aside Resolution No. 2015-108 on the ground the importation of asphalt grindings was an impermissible extension, enlargement, or intensification of the Quarry's nonconforming use in violation of the County zoning ordinance. The trial court agreed and directed the County to rescind Resolution No. 2015-108. The County and SRRQ have appealed. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The Quarry is located on property in eastern San Rafael, at 1000 Point San Pedro Road, on unincorporated land in the County of Marin. In 1941, the property was zoned "M-2, A-2, heavy industrial, limited agricultural," allowing mining as a legal use. In 1972, pursuant to a newly enacted surface mining ordinance, the County granted the Quarry an exemption for its existing mining operation and on-site production of asphaltic concrete which continued as a legal use. Ten years later, in November 1982, the property on which the Quarry is situated was rezoned to its current designation for commercial and residential use. As a consequence of the 1982 zoning, the Quarry's mining operation and on-site production of asphaltic concrete became a legal nonconforming use.[2] At that time, the production of asphaltic concrete involved the processing of mined material from the Quarry and imported sand, but no other imported materials such as asphalt grindings. In 1986, SRRQ acquired the Quarry.

In 2010, following the County's completion of an environmental review of the Quarry's operations under the California Environmental Quality Act, the County

---

[1] The Coalition is a "California nonprofit corporation founded in 1999 and chartered to protect the interests of residents living along Point San Pedro Road in the City of San Rafael, Marin County, California and to protect the local environment. Members of the Coalition live along Point San Pedro Road and in residential neighborhoods located near or adjacent to the SRRQ's property in San Rafael."

[2] Chapter 22 of the Marin County Code contains the County's Development Code, including its zoning ordinance. Marin County Code section 22.130.030 defines "nonconforming use" as "[a] use of land, and/or within a structure, that was legally established, but does not conform with this Development Code because the use is no longer allowed in the zoning district that applies to the site, as a result of amendments to this Development Code or the previous Marin County Zoning Ordinance."

2

approved an amendment (Amendment No. 1) to SRRQ's existing mining permit. In pertinent part, Amendment No. 1 expressly granted SRRQ the right to perform certain activities "on site," including "[t]he operation of an asphalt concrete batch plant using on-site aggregate materials and production of asphaltic concrete." However, SRRQ was expressly prohibited from importing "property gravel, used asphalt concrete or concrete for recycling, or dredged non-sand material."

Thereafter, on May 22, 2013, SRRQ filed an application to modify its mining permit to add Amendment No. 2, which allowed the importation of asphalt grindings to be processed on-site and used in the production of asphaltic concrete. The County issued Resolution No. 2013-52, approving Amendment No. 2 for a two-year period to expire on October 1, 2015.

The Coalition filed a timely petition for a writ of administrative mandate, challenging Resolution No. 2013-52 on the ground that the importation of asphalt grindings constituted an increase, enlargement, and/or intensification of the Quarry's nonconforming use that was prohibited by the County zoning ordinance. At the time of the 1982 zoning, the Marin County Code former section 22.78.010 read, in pertinent part: "Except as otherwise provided in this chapter, the lawful use of land existing at the time of the adoption of the ordinance codified in this title, although the use does not conform to the regulations specified by this title for the district in which the land is located, may be continued; provided, however, that no nonconforming use shall be enlarged or increased, nor shall any nonconforming use be extended to occupy a greater area of land . . . ." In 2012, the County replaced former section 22.78.010 with section 22.112.020.A, which reads: "Nonconforming uses of land. A nonconforming use of land may be continued, transferred or sold, provided that the use shall not be enlarged, increased, or intensified (e.g., longer hours of operation, more employees, etc.), nor be extended to occupy a greater area than it lawfully occupied prior to becoming a nonconforming use."

The superior court granted the contested application of the County and SRRQ for judgment on the pleadings and dismissed the petition because the Coalition had failed to file an administrative appeal with the State Mining and Geology Board (the Mining

3

Board) before seeking judicial relief. The Coalition filed a timely appeal. Ultimately, due to the passage of time, this court dismissed the Coalition's appeal on the ground of mootness. (*Point San Pedro Road Coalition v. County of Marin* (Dec. 12, 2016, A142073) [nonpub. opn.].)

While the Coalition's appeal from Resolution No. 2013-52 was pending, SRRQ filed an application in July 2015 to extend the expiration of Amendment No. 2 to allow for the continuation of the importation of asphalt grindings. Despite the Coalition's opposition to the extension application on the same ground that it had challenged the earlier approval of Amendment No. 2, the County issued Resolution No. 2015-108, approving the extension of Amendment No. 2 for another two to four years. To avoid another dismissal for failure to exhaust its administrative remedies, the Coalition timely appealed Resolution No. 2015-108 with the Mining Board, which was unsuccessful. The Coalition then filed a new petition for a writ of administrative mandate seeking to set aside Resolution No. 2015-108. In its new petition, the Coalition sought to compel the County to vacate Resolution No. 2015-108 on the same grounds vacatur was sought as to the now expired Resolution No. 2013-52. The County and SRRQ filed a joint answer and opposition to the petition.

The trial court granted the petition, finding in pertinent part that the County's approval of Amendment No. 2, allowing the importation of asphalt grindings, was based on (1) "an incorrect legal analysis" of the basic character of nonconforming uses and the circumstances under which nonconforming uses can be continued, and (2) the lack of any evidence in the entire record supporting the County's implied finding that the importation of asphalt grindings would not exceed the scope of the Quarry's nonconforming use as it existed at the time of the 1982 zoning. The court entered judgment in favor of the Coalition and issued a peremptory writ compelling the County to set aside Resolution No. 2015-108. The County and SRRQ timely appeal.

## DISCUSSION

Appellants concede the importation of asphalt grindings is not within the scope of the nonconforming use of the Quarry site in November 1982. They further concede that

4

SRRQ's request to import asphalt grindings required a determination by the County that the activity would not result in the use of the property being " 'enlarged, increased, or intensified,' " as compared to the use that existed in November 1982. They contend, however, that the County made the required determination because "under Amendment No. 2," there will be no change in use because "SRRQ simply [is] . . . allowed to incorporate[ ] recycled asphalt into its existing asphaltic operations to ensure consistency with industry standards and maintain sustainable best practices associated with the asphalt pavement industry." In other words, the County could properly find that SRRQ's importation of asphalt grindings will not constitute an enlargement, increase, or intensification of the Quarry's nonconforming use to produce asphaltic concrete on site. For the reasons set forth below, we see no merit to appellants' contention.

We initially note that, despite appellants' arguments to the contrary, neither the superior court nor this court are bound by the County's analysis of the law or its implied findings of fact. Because the issue present here can be resolved on the evidence in the administrative record which is undisputed, "the ultimate conclusion to be drawn from the evidence is a question of law." (*Hansen Brothers Enterprises, Inc. v. Board of Supervisors* (1996) 12 Cal.4th 533, 560 (*Hansen Brothers*).) "The [County's implied] findings of fact are not determinative. The court must make its own decision as to the legal impact of those facts . . . . [And, indeed] the [County] lacks the power to waive or consent to [a] violation of the zoning law." (*Id*. at pp. 563–564.)

Fundamentally, "the intent" of Marin County's zoning ordinance is to "*discourage the expansion of nonconformities*, but to permit them to continue to exist and to be maintained and enhanced to protect public safety and property values." (Marin County Code § 22.112.010; italics added.) The zoning ordinance therefore allows nonconforming uses to continue, "provided that the use shall not be enlarged, increased, or intensified (e.g., longer hours of operation, more employees, etc.), nor be extended to occupy a greater area than it lawfully occupied prior to becoming a nonconforming use." (Marin County Code § 22.112.020.A.) Thus, to the extent appellants argue to the contrary, we conclude the language in the zoning ordinance can only be interpreted as

5

being consistent with the common law principles governing nonconforming uses as explained by our Supreme Court: " 'The ultimate purpose of zoning is . . . to reduce all nonconforming uses within the zone to conformity as speedily as is consistent with proper safeguards for the interests of those affected,' " and "that, given this purpose, . . . a strict policy against extension or expansion of those uses" is warranted. (*Hansen Brothers*, *supra,* 12 Cal.4th at p. 568.)

The record demonstrates, as the trial court explained, that SRRQ's proposed processing of asphalt grindings cannot be equated with the processing of on-site mined materials and imported sand that was used in the production of asphaltic concrete at the time the use became nonconforming under the 1982 zoning ordinance. The processing of the asphalt grindings involves more than the mere substitution of one type of raw material for another, which is then stockpiled and fed into existing equipment to be used in the production of asphaltic concrete. Instead, the processing of asphalt grindings involves new full truckloads of asphalt grindings traveling to the site. " 'Once at the Quarry site, [the asphalt grindings] [are] . . . unloaded, stockpiled [near the asphalt plant], and then screened prior to reuse as raw feed material in making new asphalt concrete at the existing Quarry asphalt batch plant.' " The "[r]ecycled aggregate is produced by crushing concrete and asphalt according to strict manufacturing standards." "Heavy crushing equipment is required to break up the hunks into aggregate. . . . A crushing plant may include a hopper to receive the material, a jaw to break it into more manageable pieces, a cone or impact crushers to further reduce its size, a vibrating screen to sort to the required specification, and a conveyor belt with a rotating magnet to remove metal contamination such as rebar." "Depending on grinding particle size and asphalt mix design, grindings *also* may be processed through existing on-site crushing equipment." (Italics added.) As the trial court commented, "the only reasonable conclusion" is that the processing of the asphalt grindings is "an operation in itself – with special considerations for crushing, blending, mixing, screening and the like. . . ." Additionally, once the asphalt grindings are processed into RAP (recycled asphalt pavement), " '[a] feed hopper and conveyor (*similar to* existing on-site equipment) [is]

6

. . . used to deliver the grindings to the asphalt batch plant.' " (Italics added.) The new equipment was estimated to cost " 'somewhere near $350,000.' " Thus, Amendment No. 2 does not merely authorize SRRQ to replace outmoded equipment and modernize previous methods used to produced asphaltic concrete as a natural or gradual change in the nonconforming use. Instead, SRRQ is authorized "to conduct a new and additional operation – [the processing] of asphalt grindings obtained from off-site – on property not presently zoned for industrial use."

Appellants ask us to uphold the County's approval of Amendment No. 2 because the importation of asphalt grindings will not "result in any noticeable changes" in the Quarry operations on the property: there will be no increase in project emissions, the use of recycled asphalt at the property will result in a net reduction in regional air emissions because the activity would eliminate additional truck traffic otherwise needed to transport the raw materials to SRRQ's batch plant in Richmond; there will be no increase in truck traffic traveling to and from the Quarry property; the stockpiling of imported asphalt grindings will be subject to the same dust-abatement and mitigation measures that pertained to other on-site stockpiled material; existing limits on total asphalt production will remain the same, and there is no evidence that incoming fully loaded trucks carrying asphalt grindings will increase vibration, noise, emissions, and road concerns, and in fact heavier trucks often result in less noise and vibrations. However, appellants' assertions as to the benefits of the importation and processing of asphalt grindings on the Quarry site are not germane to the issue before us – namely, whether the activity is an impermissible expansion of the nonconforming use of the property that was extant at the time of the 1982 zoning.

We find more relevant to our resolution of the matter that appellants have failed to show that the proposed change (importation and processing of asphalt grindings on site) is required for, or reasonably related to, the existing nonconforming processing of on-site mined material and imported sand for the production of asphaltic concrete. Additionally, there has been no showing that a denial of the request to import asphalt grindings would restrict SRRQ's vested right to continue to produce asphaltic concrete using processed

7

on-site mined material and imported sand, or that SRRQ would be required to change, in any way, the manner in which it produced asphaltic concrete using processed on-site mined material and imported sand. Rather, SRRQ concedes that "the new process 'simply replaces about 15-25% of the virgin rock and 1% of virgin asphaltic oil used in SRRQ's existing concrete operations with recycled materials.' " As the trial court noted, the replacement contemplated by SRRQ is, in itself, "problematic." To the extent the recycling operation would allow SRRQ to conserve its on-site material, the new activity would prolong the nonconforming use rather than reducing it " 'to conformity as speedily as is consistent with proper safeguards for the interests of those affected.' " (*Hansen Brothers*, *supra*, 12 Cal.4th at p.568.) The very fact that the proposed new operation of importing and processing asphalt grindings on site "may be immediately less incompatible with its surroundings might cause it to perpetuate itself, while the prior [processing of on-site mined material and imported sand] would have withered away." (*City of Los Altos v. Silvey* (1962) 206 Cal.App.2d 606, 610 (*City of Los Altos*).)[3]

The County, by its 1982 zoning, decided that the area on which the quarry operations is situated is to be limited to commercial and residential use. The exception for a nonconforming use has been "preserved only as allowed by statute or as protected against a taking violative of due process of law." (*City of Los Altos*, *supra,* 206 Cal.App.2d at p. 609.) " 'Unless owners of nonconforming uses in zoning areas are required to adhere to the excepted use in volume of trade as well as character of business, zoning laws will be rendered ineffectual and such favored parcels of property will assume great values based not upon a natural growth, but upon the right of the owner to extend and enlarge the existing nonconforming use.' " (*Edmonds, supra*, 40 Cal.2d at p. 652.) " 'The underlying spirit of a comprehensive zoning plan necessarily implies the

---

[3]     Because "each case must stand on its own facts" (*Edmonds v. County of Los Angeles* (1953) 40 Cal.2d 642, 651 (*Edmonds*)), we see no need to address appellants' challenge to the trial court's reliance on *Paramount Rock Co. v. County of San Diego* (1960) 180 Cal.App.2d 217, 223, and other cases cited in support of the Coalition's position during the trial court proceedings, and the trial court's rejection of appellants' reliance on *Endara v. City of Culver City* (1956) 140 Cal.App.2d 33, 38.

8

restriction, rather than the extension, of a nonconforming use of land, and therefore to whatever extent the particular act fails to make express provision to the contrary, a condition that the lawful nonconforming use of land existing at the time of the adoption of the ordinance may continue must be held to contemplate only a continuation of substantially the same use which existed at the time of the adoption of the ordinance, and not some other and different kind of nonconforming use which the owner of the land might subsequently find to be profitable or advantageous. . . .' " (*County of Orange v. Goldring* (1953) 121 Cal.App.2d 442, 447.)

We therefore conclude that the County's approval of Resolution No. 2015-108, to permit the importation of asphalt grindings, allows SRRQ to change and unnaturally expand or increase its nonconforming use in violation of the County zoning ordinance. "Any other construction of the application [of the zoning ordinance] destroys the spirit and purpose of the zoning ordinance," which prohibits the expansion of nonconforming uses. (*City of Yuba City v. Cherniavsky* (1931) 117 Cal.App. 568, 572.) Additionally, when the County acts in its administrative power to amend a permit under the zoning ordinance, "it is bound by the terms of the ordinance until the ordinance is amended through proper legislative procedure. [Citations.]" (*Johnston v. Board of Supervisors* (1947) 31 Cal.2d 66, 74, disapproved on another ground in *Bailey v. County of Los Angeles* (1956) 46 Cal.2d 132, 139.) Because SRRQ's importation of asphalt grindings is not within the scope of the existing nonconforming use and the activity constitutes an impermissible extension or enlargement of the nonconforming use in violation of the County zoning ordinance, the County had no authority to issue Resolution No. 2015-18 approving Amendment No. 2. Accordingly, the trial court properly directed the County to set aside Resolution No. 2015-18.

Lastly, we note appellants also challenge the trial court's ruling that SRRQ's request to import and process asphalt grindings on the Quarry site was barred by earlier litigation between the parties under the doctrines of collateral estoppel and judicial estoppel. However, even if those legal doctrines do not apply, as appellants contend, no different outcome would result.

9

## DISPOSITION

The judgment is affirmed. Respondent Point San Pedro Road Coalition, Inc. is awarded costs and attorney fees on this appeal. The matter is remanded to the trial court to determine reasonable attorney fees in connection with this appeal. (Code Civ. Proc., § 1021.5.)

                                                _____\
                                                Petrou, J.

WE CONCUR:

_____\
Siggins, P.J.

_____\
Fujisaki, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| POINT SAN PEDRO ROAD COALITION,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>COUNTY OF MARIN et al.,<br><br>      Defendants and Appellants;<br><br>SAN RAFAEL ROCK QUARRY, INC.,<br><br>      Real Party in Interest and Appellant. | A150002<br><br>(Marin County<br>Super. Ct. No. CIV1504430)<br><br>ORDER CERTIFYING OPINION<br>FOR PUBLICATION;<br>NO CHANGE IN JUDGMENT |

THE COURT:

The opinion in the above-entitled matter filed on March 6, 2019, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports, and it is so ordered.


Date:      April 3, 2019            SIGGINS, P.J.      , P. J.

Trial Court:     Marin County Superior Court

Trial Judge:     Paul M. Haakenson, J.

Counsel:         Cox, Castle & Nicholson, Michael Herman Zischke and James M. Purvis;
                 Cota Cole, Cota Cole & Huber, Derek P. Cole for Defendants, Real
                 Party in Interest and Appellants.

                 Edgcomb Law Group, John D. Edgcomb for Plaintiff and Respondent.